UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:11-CR-15 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| ABBY L. RICE | ) | |

# <u>M E M O R A N D U M</u>

Before the Court is a Joint Motion to Reconsider by the United States and Defendant Abby

L. Rice ("Defendant"), wherein the parties ask the Court to reconsider its declining to proceed with

sentencing in this case (Court File No. 17).  For the reasons explained below, the Court will **DENY**

this motion (Court File No. 17).

On Thursday, July 7, 2011, Defendant was scheduled for sentencing before the Court.

Defendant had entered a guilty plea to a one-count Bill of Information alleging a violation of the

bank fraud statute, 18 U.S.C. § 1344.   After the case was called the Court asked the parties to

further elaborate upon what the fraudulent scheme was that Defendant had allegedly devised and

executed.  Following up on the parties' explanation, the Court asked how that scheme put the victim

bank at risk.  The parties not being able to state how the scheme put any of the victim bank's assets

at risk, the Court decided not to go forward with Defendant's sentencing, but continued Defendant's

sentencing until October 6, 2011.

On July 8, 2011, the parties filed the Joint Motion to Reconsider (Court File No. 17).  In the

motion the parties argue the bank fraud statute does not require a bank's funds be put at risk.  They

cite to the United States Court of Appeals for the Sixth Circuit's decision in *United States v. Everett*,

270 F.3d 986 (6th Cir. 2001) for support.

Because the Court has observed and experienced that many practitioners, including Assistant

United States Attorneys, exhibit much uncertainty about the meaning and reach of the bank fraud statute, the Court will use this opportunity to discuss § 1344 and its reach. In doing so, the Court will elaborate on the requirements of the statute and why the charging documents in this case give the Court pause. Considering *Everett* and its proper interpretation, the Court remains unpersuaded that the scheme set out in the Bill of Information and as further explained by counsel at the sentencing hearing satisfies the requirements of the statute. Accordingly the Court will not set Defendant's sentencing hearing at an earlier date, but will maintain the October 6, 2011 date.

I.    <u>ANALYSIS</u>

   **A. The Bank Fraud Statute**

   The federal bank fraud statute is not a model of clarity. It was passed in an effort to ensure bank fraud schemes such as check kiting could be prosecuted federally in the wake of the Supreme Court ruling in *Williams v. United States*, 458 U.S. 279 (1982),[1] and to combine in one statute the authority found in a number of federal laws to prosecute offenses against banks and other financial institutions.[2] Included within its scope are offenses that were formerly prosecuted under the false statement to banks statute, 18 U.S.C. § 1014, and the misapplication of bank funds statute, 18 U.S.C.

---

   [1]In *Williams*, the Supreme Court held one of the forerunners to the bank fraud statute, the false statement to a bank statute, 18 U.S.C. § 1014, did not apply to check kiting. In the Court's view, presenting a check to a bank did not contain a representation that there were sufficient funds in the presenter's account to cover the check. This ruling created a void in federal statutes in addressing one of the classic types of bank fraud. *See United States v. Stone*, 954 F.2d 1187, 1190 (6th Cir. 1992) (explaining that "[i]n response to the Court's decision in *Williams*, Congress passed the more recent bank-fraud statute with the express intent of bringing check-kiting schemes within its reach").

   [2]*See Stone*, 954 F.2d at 1190.

§ 656.[3]  Section 1344 was modeled on the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341

and 1343.  *See United States v. Mason*, 902 F.2d 1434, 1441 (9th Cir. 1990) ("the bank fraud statute

directly tracks or is parallel to the mail and wire fraud statutes").  It was the intent of Congress that

the statute be broad so as to reach a wide range of fraudulent crimes committed against federal

financial institutions.  For that reason cases decided under the mail and wire fraud statutes provide

guidance for § 1344.  *See United States v. Bennett*, 1996 WL 477048, *4 (9th Cir. Aug. 21, 1996)

("we have noted that cases interpreting the mail fraud statutes are relevant in interpreting the bank

fraud statute because the bank fraud statute was modeled upon the mail and wire fraud statutes").

The statute reads in relevant part:

§ 1344.  Bank fraud.

Whoever knowingly executes, or attempts to execute, a scheme or artifice –

(1)  to defraud a financial institution; or

(2)  to obtain any of the moneys, funds, credits, assets, securities or other property
owned by, or under the custody or control of, a financial institution, by means of
false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or
both.

From the text of the statute one sees two separate and distinct crimes are covered.  *See*

*Brewster v. United States*, 559 F. Supp. 2d 1311, 1313 (S.D. Fla. 2008) ("the[] statute[] establish[es]

---

[3]*See* S. Rep. 98-225, 378 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3518-19 ("In
*Williams*, the Court concluded this form of fraud did not fall within the scope of 18 U.S.C. § 1014
because a check did not constitute a 'statement' within the meaning of the statute.  As a result of this
decision, the Committee has been advised by the Justice Department that it has been necessary to
cease prosecution of numerous pending check-kiting cases. . . . These various gaps in existing
statutes, as well as the lack of a unitary provision aimed directly at the problem of bank fraud, in the
Committee's view create a plain need for enactment of the general bank fraud statute set forth in this
part of Title XI.").

two distinct offenses"). The first is the knowing execution of a scheme or artifice to defraud a financial institution. This offense requires an intent to defraud. It does not require the use of a false or fraudulent pretense, representation, or promise. Check kiting would fall within this prong since in check kiting there is no false or fraudulent pretense, representation, or promise associated with the presentment of the checks to the victim bank. *Williams*, 458 U.S. at 284 ("a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'"). Nonetheless, the check kiter is defrauding the victim bank out of its funds so long as the kite is in operation.

The second crime is the knowing execution of a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises, the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution. This offense does require the use of a false or fraudulent pretense, representation, or promise that is material.[4] However, it does not require an intent to defraud. A person may inflate his financial statement to obtain a loan fully expecting to be able to pay the bank back in full at the time the loan becomes due. The borrower may not have the intent to defraud or harm the bank, but he has made a material false statement to the bank to induce it to make the loan. *United States v. Davis*, 397 F.3d 340, 345 (6th Cir. 2005) ("this Court has held that it is 'not a defense [to § 1344] that the defendant 'may not have intended to cause the bank to lose any money; it is sufficient that he was shown to have intended to facilitate the transfer of bank funds' in pursuit of a fraudulent scheme.'").

Because there are two distinct offenses described in the bank fraud statute, the elements that must be proven by the prosecution vary depending on which offense is charged. There is some

---

[4]Materiality of the false pretense, representation, or promise is an implicit element under the second prong of the statute. *See Neder v. United States*, 527 U.S. 1, 25 (1999) ("we hold that materiality of falsehood is an element of the federal . . . bank fraud statute[]").

4

confusion in the case law regarding this, and often the cases conflate the two offenses into just one crime. In doing so, the cases fail to distinguish the required state of mind for the two crimes.

Although risk to the bank is not mentioned in either prong of the statute and is not an element of either of the offenses, it is often used as a short hand to describe the necessary state of mind of an offender.[5] Risk of loss can be thought of as the bridge between the two offenses, or as the thread the two offenses have in common. To put it simply, it is hard to imagine how one could devise a scheme or artifice to defraud a bank, with the necessary intent to defraud, without at the same time either putting the funds of the bank at risk or intending to put the funds of the bank at risk. Using the check kiting example, the funds of the bank are at risk so long as the kite is in operation. If the kite crashes then one of the banks, if not both, will be left holding the bag for the bad checks. The risk of loss is created by the bank having unwittingly and unknowingly extended credit to the kiter. The bank has also been defrauded out of its ability to make its own decisions regarding extending credit.

It is also hard to imagine how one could devise a scheme or artifice to obtain funds from a

---

[5]It is not clear where the terminology "risk of loss" or "risk to the bank" first originated. The concept of risk of loss may derive from the decision in *United States v. Gens*, 493 F.2d 216 (1st Cir. 1974). *Gens* involved a violation of 18 U.S.C. § 656, the misapplication of bank funds statute. There the defendant was charged with arranging "nominee" loans to himself. The court identified three types of circumstances under which a violation could occur, but stated that if the nominee borrower was a credit worthy borrower who understood the obligation to repay the bank and the loan proceeds were given to a third person, no crime had been committed. In such an instance, the bank is not exposed to a risk of loss. Although *Gens* did not use the terminology of risk of loss, the logic of the decision embraces the concept, and this concept is prevalent in cases discussing bank fraud. Risk to the bank does not mean the bank must suffer an actual financial loss, *see United States v. McDonald*, 209 F. App'x 748, 752 (10th Cir. 2006), or even that the perpetrators intended the bank to suffer an actual financial loss, *see United States v. Double*, Nos. 99-50319, 99-50320, 2000 WL 1878958, *2 (9th Cir. 2000) (finding "no merit" to the claim a defendant must intend to expose a bank to actual loss or risk of loss). Risk of loss also includes the possibility of the victim bank being exposed to civil litigation. *McDonald*, 209 F. App'x at 751.

5

bank by means of materially false pretenses, representations, and promises without putting the funds of the bank at risk, even if that was not the intent or goal of the offender.[6] If the funds of the bank were not put at risk, then in all likelihood, the false statement is not material. An example of this would be where a credit worthy borrower understated his income on a loan application. Obviously the understated income is a false representation but since it does not put the funds of the bank at risk the false statement is immaterial. On the other hand, if the borrower overstated his income on the loan application and was in reality a poor credit risk, then the funds of the bank would be at risk because the bank had made a loan assuming creditworthiness that was not present. This is also true with respect to a borrower that inflates assets. In short, it is fair to say that while risk of loss is not an element of the offense, it is a *sine qua non* for bank fraud.

**B. The Bill of Information**

The charge against Defendant in this case was initiated by the filing of a Bill of Information. The one count of the Bill of Information reads:

> The United States Attorney charges that from on or about July 16, 2008 through on or about July 28, 2010, in the Eastern District of Tennessee and elsewhere, the defendant, ABBY L. RICE, devised a scheme to defraud Cohutta Banking Company, a federally insured financial institution, and to obtain funds held by Cohutta Banking Company by means of false representations.

> It was part of the scheme to defraud that the defendant, ABBY L. RICE, would use her position as Office Manager of Advanced Power and Lighting, Inc. in Chattanooga, Tennessee, to embezzle monies held by Cohutta Banking Company for Advanced Power and Lighting, Inc. by making unauthorized withdrawals of funds to which she was not entitled.

---

[6]There is no necessity of proof of an intent to harm the victim bank, rather "the intent necessary for a bank fraud conviction is an intent to *deceive* the bank in order to obtain from it money or other property." *United States v. Kenrick*, 221 F.3d 19, 26-27 (1st Cir. 2000) (emphasis added).

6

It was a further part of the scheme to defraud that the defendant, ABBY L. RICE, would request funds from Computerized Payroll Solutions under false pretenses, causing the fraudulent withdrawal of monies from Advanced Power and Lighting, Inc.'s account at Cohutta Banking Company, and the fraudulent transfer of those funds to an account of the defendant, ABBY L. RICE.

Although the Bill of Information in the first paragraph alleges both prongs of the bank fraud statute, that is, both a scheme and artifice to defraud and a scheme and artifice to obtain money, funds, and assets held by the victim bank, the second and third paragraphs only allege a scheme to defraud. From the allegations it appears Defendant stole money from her employer, Advanced Power and Lighting, which had an account at Cohutta Banking Company. The second paragraph, although referencing a "scheme to defraud," does not suggest that it was the intent or object of the alleged scheme that Cohutta Banking Company be defrauded.

The third paragraph also begins with the scheme to defraud language and alleges that funds would be requested from Computerized Payroll Solutions under false pretenses. This perhaps invokes the second prong of the bank fraud statute, although there is no allegation that the false statement was made to Cohutta Banking Company, or that any false statement ever reached Cohutta Banking Company. Nor does the charge state what the false pretense was.

### C. The Factual Basis

It is the practice in this district for the Untied States Attorney to file into the record prior to the time of the guilty plea a written document containing the factual basis required by Rule 11.[7] The factual basis filed in connection with the guilty plea of Defendant provides:

All parties agree that the facts supporting the plea are as follows: From April 2005 through August 2010, ABBY L. RICE, was employed by Advanced Power and

---

[7]"Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3).

Lighting, Inc. (APL) as Office Manager. She abused that position which included management of the payroll of APL, by fraudulently requesting that the business' payroll service (Computerized Payroll Solutions, Inc.) pay bonuses to her from APL's account at Cohutta Banking Company, a federally insured financial institution to which she was not entitled. Among the fraudulent transactions in which she engaged was that charged in the Information, in which she requested, and was paid a bonus to which she was not entitled from APL's account at Cohutta Banking Company to an account of the defendant, in the amount of $7,500 on February 8, 2010, within the Eastern District of Tennessee. Through this and similar fraudulent transactions she obtained through false pretenses from APL's account at Cohutta Banking Company approximately $380,722.46.

What can be gleaned from both the Bill of Information and the factual basis is that Rice, an employee of Advanced Power and Lighting, Inc. ("APL"), held the position of Office Manager. In that capacity she was authorized to write checks on, or withdraw funds from, the bank accounts of APL, and was authorized to order Computerized Payroll Solutions to pay funds out of APL's bank account at Cohutta Banking Company. Computerized Payroll Solutions also was authorized to write checks on or withdraw funds from Cohutta Banking Company. In violation of the trust placed in her by APL, Rice ordered Computerized Payroll Solutions to pay to herself funds to which she was not entitled. These funds came from APL's account at the Cohutta Banking Company. Rice did not make any representation or statement directly to Cohutta Banking Company. Even though the checks or withdrawals were not authorized by APL, since Rice was an authorized signatory on the accounts, APL bore the financial loss and Cohutta Banking Company suffered no loss and bore no risk of lost. In sum, Cohutta Banking Company received instructions from a party authorized by the account holder, APL, to pay funds from the account to an employee of APL.

### D. The *Everett* Decision

The parties primarily rely upon the Sixth Circuit case of *United States v. Everett* for their argument that under § 1344 there is no requirement the victim bank be placed at a risk of loss, and

that the scheme alleged in the Bill of Information sufficiently alleges an offense. The language from *Everett* relied upon by the parties reads:

> [T]o have the specific intent required for bank fraud the defendant need not have put the bank at risk of loss in the usual sense or intended to do so. It is sufficient if the defendant in the course of committing fraud on someone causes a federally insured bank to transfer funds under its possession and control. *See* 18 U.S.C. § 1344(2) (2000).

270 F.3d at 991.

This language from *Everett,* that is, to have the specific intent required for bank fraud a defendant need not have put the bank at risk of loss in the usual sense or intended to do so, requires interpretation. What did the panel mean when it said "risk of loss in the usual sense?" We know that risk of loss is not an element of the offense. Turning to the facts in *Everett* is helpful in determining the meaning of this phrase.

In *Everett*, the defendant Justine Everett and her co-defendant, Kathy Mariani, both worked for an accounting firm. Everett had been formerly employed at another accounting firm where one of her clients was Stein's Expert Auto Body, Inc. ("Stein's"). Stein's hired Mariani to work as its bookkeeper. As Stein's bookkeeper, Mariani was a signatory on Stein's bank accounts. Everett was never an authorized signatory on Stein's bank accounts. After Mariani left her employment at Stein's it was discovered that almost $100,000 in Stein's checks had been issued to Everett or made payable to cash and endorsed by Everett. Everett and Mariani were jointly charged with bank fraud and complicity. Mariani pleaded guilty before trial and testified against Everett. At trial, evidence was introduced concerning four checks made payable to Everett. Everett testified Mariani told her she could sign Stein's name to the checks. Mariani testified she knew Everett was writing unauthorized checks to herself. She also testified as to steps she and Everett took to hide their

crimes.

From these facts we see two defendants were involved in the offense. One, Mariani, was authorized to write checks on Stein's bank accounts. The other, Everett, was not so authorized. After the prosecution presented its case, the trial judge dismissed one of the counts in the indictment because it was based on a check signed by Mariani. The *Everett* opinion says:

> After presentation of the evidence, the trial court granted Appellant's motion to dismiss count two of the indictment because the checks in question in count two had been signed by Mariani, an authorized signatory. Thus, the bank would not be subject to a risk of loss even if the checks were written for an unauthorized purpose.

*Id*. at 989.

On appeal Everett argued she had no intent to defraud a bank. From the evidence it was obvious that Everett's intent was to defraud Stein's. She was writing checks on Stein's account and was cashing checks written on Stein's accounts. However, by forging Stein's signature on checks she subjected the bank that cashed the check to risk, even though her intent may have been to defraud Stein's. Everett's conduct stands in contrast with Mariani's. Mariani was an authorized signatory, so she did not expose the bank to risk since Stein's would be responsible for her abuse of trust.

With these facts in mind we can better understand the panel's language that, to have the specific intent for bank fraud, the defendant need not have put the bank at "risk of loss in the usual sense" or intended to do so. It is clear Everett did not have the intent to harm the bank or to put the bank's assets at risk. However, her actions in attempted to defraud Stein's necessarily also put the bank's funds at risk. This is what the panel meant when it went on to say: "It is sufficient if the defendant in the course of committing fraud on *someone* causes a federally insured bank to transfer funds under its possession and control." *Id*. at 991. This describes what happened in *Everett*.

10

Everett committed a fraud on Stein's, and in the course of that fraud caused the bank to transfer funds to her. The panel explained its decision by saying:

> It has been stated that the purpose of § 1344 is to protect the federal government's interest as an insurer of financial institutions. Thus, even if [Everett] did not intend to defraud the bank, causing a bank to transfer funds pursuant to a fraudulent scheme reduces the funds the bank has available for its loans and other activities and almost inevitably causes it some loss.

*Id*.

The statute's purpose of protecting the bank explains why the concern is with the risk of loss. Mariani's actions did not pose a risk of loss to the bank because Stein's, not the bank, faced the loss. The bank in that instance would not suffer a reduction in funds available for its loans and other activities, nor would it be on the hook for honoring the checks at issue, since Mariani was an authorized signatory. Everett's actions did pose a risk of loss to the bank because, in honoring a check with a forged signature, the bank might incur civil liability, might have to absorb a monetary loss, or, at the least, might face adverse reactions from its customer Stein's. *See United States v. Barrett*, 178 F.3d 643, 648 n.3 (2d Cir. 1999) ("banks face practical adverse consequences and potential liability problems when they cash checks over forged endorsements"). Additionally, Everett's actions would "almost inevitably cause[] [the bank] some loss" since payment of forged checks would reduce the funds the bank has available for its loans and other activities. "Presentation to a financial institution of a fraudulent document that exposes the institution itself to a potential loss if the document be honored and funds be released, such as a forged or altered document, is within the scope of § 1344." *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999).

Looking at the *Everett* decision with the facts in mind, it becomes clear the panel did not mean a bank fraud occurs whenever funds are taken out of a bank during the course of a fraud, even

where there is no risk of loss to the bank. If this were not true then con games such as "pigeon drop" schemes would violate § 1344. *United States v. Staples*, 435 F.3d 860, 867 (8th Cir. 2006) ("For example, a 'scheme to pass bad checks,' and a 'pigeon drop' scheme, in which a victim is induced to withdraw money from a bank and entrust it to the defendant, have been held insufficient to establish bank fraud. *Laljie*, 184 F.3d at 190. The reasoning of these courts is typified by the statement of the Seventh Circuit that the purpose of the bank fraud statute 'is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions.'" ) (quoting *United States v. Davis*, 989 F.2d 244, 247 (7th Cir. 1993)). *Everett* acknowledges as much with its concluding language. "That is not to say that in cases where the bank has minimal involvement, such as where a swindler deceives someone into voluntarily writing checks to the swindler on a good account, the government would not be better advised to proceed under the wire or mail fraud statutes." *Everett*, 270 F.3d at 991.

In the present case it would appear from the Bill of Information and the factual basis that, at best, the Cohutta Banking Company had "minimal involvement" in Rice's scheme, that Rice wrote checks on a good account for which she was an authorized signatory, and that "the government would [] be better advised to proceed under the wire or mail fraud statutes." *Id*.

### E. The *Warshak* Decision

The parties also rely upon the recent case of *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010). The panel there approved jury instructions that informed the jury "the government could demonstrate the requisite intent to defraud (*i.e.*, the second element of the offense) in 'several different ways,' and stated that 'it is not necessary that a bank be the intended target of the fraud.' The district court also suggested that 'the government can . . . show that the defendant had the

12

requisite intent to defraud, even if the intended target . . . was a third party, if it proves . . . that: (1)

the defendant exposed a bank to risk of loss or intended to do so; or (2) caused the bank to transfer

funds that were in its possession or control.'" *Id.* at 312. In expressing its agreement with this

instruction, the panel stated:

> In *Everett*, we definitively held that "to have the specific intent required for bank
> fraud the defendant need not have put the bank at risk of loss in the usual sense or
> intended to do so." 270 F.3d at 991. Rather, "[i]t is sufficient if the defendant in the
> course of committing fraud on *someone* causes a federally insured bank to transfer
> funds under its possession and control." *Ibid.*; *see United States v. Reaume,* 338 F.3d
> 577, 581 (6th Cir.2003) (" *Everett* . . . can be said to stand for the proposition that the
> bank fraud statute is violated, even if the intended victim of the fraudulent activity
> is an entity other than a federally insured financial institution, when the fraudulent
> activity causes the bank to transfer funds."). In *Reaume*, this court extended the
> principle articulated in *Everett*, "find[ing] that intent to defraud the federally insured
> institution itself is satisfied where: (1) the intent to defraud some entity was present;
> and (2) that intended fraud placed a federally insured financial institution at a risk of
> loss." 338 F.3d at 582.

*Id.* at 313.

Nothing in this language suggests that risk of loss is not the underlying rationale for bank

fraud. In concluding its discussion the court said: "In the Sixth Circuit, a defendant may be

convicted of bank fraud if he intends to defraud someone and implements a fraudulent scheme that

either causes a federally insured financial institution to transfer funds or exposes that institution to

some degree of risk." *Id.* The language "transfer of funds" clearly comes from *Everett* and refers

to instances where the transfer reduces the funds the bank has available for its loans and other

activities. Additionally, the facts in *Warshak* do not involve a defendant whose actions did not pose

a risk of loss to the victim bank. The jury that convicted Warshak was instructed that it could find

an intent to defraud if the government proved Warshak "exposed a bank to a risk of loss or intended

to do so." *Id*. at 312.

The facts in *Warshak* are typical of what one sees in sophisticated bank fraud cases and unlike the facts of Rice's case. Warshak, along with several others, ran a series of companies that marketed Enzyte, a product that "was purported to increase the size of a man's erection." *Id.* at 277. Sales were generated by television and radio commercials and use of the internet. The ads contained a number of false and fraudulent statements. Customers who made just one order were enrolled in an "auto-ship" program without their knowledge, which resulted in additional product being shipped and additional charges to their credit cards.

To conduct his company's business, it was crucial Warshak be able to accept credit card payments. In order to do so, Warshak obtained lines of credit from several merchant banks. Warshak had to submit applications to the banks to set up the lines of credit. Warshak's merchant account at one bank was terminated because of excessive "chargebacks," that is, reversed transactions which occur when a customer disputes a charge. "Merchant banks – and credit-card processors – will generally not do business with merchants that experience high volumes of chargebacks, as those merchants present a greater financial risk." *Id.* at 279.

Warshak and his cohorts were charged with a variety of offenses, including bank fraud. "In each of the bank-fraud counts, the defendants were charged with scheming to defraud a merchant bank in two ways. First, they were alleged to have 'falsely inflated the number of sales transactions in order to cause the corresponding ratio of credit chargebacks from disputed credit card charges to appear lower than, in fact, it was.' Second, they were alleged to have submitted falsified applications to obtain credit-card processing services from merchant banks and processors." *Id.* at 314. Both of these actions would constitute a scheme to obtain funds from the banks by means of false pretenses, representations, and promises.

14

In addressing the argument of the defendants that manipulation of the chargeback ratio did not cause any of the banks to transfer funds, the court said "there is evidence in the record suggesting [] that the merchant banks did indeed transfer funds as a result of the chargeback-manipulation scheme." *Id*. at 315. In response to the defendants' argument they did not expose the bank to a risk of loss, the court further noted "since there is sufficient evidence to show that the merchant banks transferred funds under their control, the conviction may be sustained even if the government failed to prove that the banks took on risk as a result of the scheme." *Id*. (citing *Everett*, 270 F.3d at 991). The court then went on to say:

> Nonetheless, there is competent evidence in the record indicating that the efforts to depress [Warshak's] chargeback ratio saddled the merchant banks with risk. First of all, there was abundant testimony that the merchant banks provided [Warshak] with lines of credit. It is axiomatic that the extension of credit is accompanied by the risk of loss. Thus, in maintaining its processing relationship with [Warshak], each bank was subjecting itself to risk. Furthermore, there was testimony indicating that the merchant banks would have cut off their respective relationships with [Warshak] if the chargeback ratio had exceeded 1%. Consequently, one may reasonably conclude that, because of the chargeback scheme, banks retained risks that they would otherwise have shed. As a result, there was sufficient evidence to suggest that the defendants acted with the requisite intent to defraud.

*Id.* (footnote omitted).

Although the fraud was sophisticated, stripped to the essentials Warshak made false statements to a bank to obtain lines of credit, that is, bank funds. The false statements were material because they induced the bank to extend the credit and to maintain a relationship with Warshak. This meets all of the requirements of bank fraud under § 1344(2). Even had the bank not extended credit, Warshak still would have committed bank fraud because it was his intent to obtain the bank's funds. Warshak's material false statements put the bank's funds at actual risk to the extent the bank extended the credit; if the bank did not extend the credit, his material false statements were

15

nonetheless made with the intent to obtain the funds in a manner that would necessarily put the funds at risk.

Nothing in *Warshak* compares with the facts in the present case. The charge against Rice in the Bill of Information does not allege Rice made a false statement or representation to Cohutta Banking Company, or a false statement or representation that she should have foreseen would go to Cohutta Banking Company. There is nothing in the case that suggests that Cohutta Banking Company relied upon any false statement or representation or that any false statement or representation was capable of inducing reliance on the part of Cohutta Banking Company. There is nothing in the case regarding an extension of credit or manipulation to maintain a relationship with the bank, and there is no indication Cohutta Banking Company was subjected to any risk of loss. Quite simply, *Warshak* counsels against, not for, finding Rice committed bank fraud.

### F. The *Reaume* Decision

The panel in *Warshak* also referred to *United States v. Reaume*. The facts in *Reaume* do not support the parties' position in the present case. There, Reaume and two coconspirators opened up checking accounts at a bank using false names and identities. The defendants then purchased merchandise by writing checks on these accounts. The accounts did not have sufficient funds to cover the checks. The defendants would return the merchandise for refunds before the merchants were notified the checks were no good. The bank caught all of the fraudulent checks and did not suffer a loss. On appeal, Reaume argued the evidence demonstrated he intended to defraud the merchants and not the bank, therefore he should not have been convicted of bank fraud. The Sixth Circuit reiterated its holding that proof of loss is not required, but then went on to say:

> In the present case, the Bank was clearly at a risk of loss. Evidence was presented
> at trial to demonstrate that, when the Bank receives an NSF check, it makes a

16

decision to either honor the check anyway or to dishonor the check. If the check is dishonored, the Bank does not lose any money, but if the check is honored, and the account holder fails to pay back that debt to the Bank, the Bank suffers a loss. Therefore, it is clear that Reaume's fraudulent activity, regardless of the intended victim, could have caused the Bank to transfer funds. If in fact the Bank had transferred funds, then this case would clearly be governed by *Everett*, because an intent to defraud someone would have caused the Bank to transfer funds.

*Id*. at 581-82.

The defendant in *Reaume* is close factually to the defendant in *Everett*. Reaume made false material statements to the bank for the purpose of obtaining the bank's funds. Reaume's primary intent was to obtain merchandise and then to return the merchandise for cash. However, to obtain the merchandise he had to present the merchants with checks written on his fraudulently obtained bank account. He could not have cared less whether the bank paid or did not pay the checks. If the bank paid the checks, then it obviously would have suffered a loss, not just been exposed to a risk of loss. Reaume would have obtain funds of the bank through means of false and fraudulent pretenses and representations. Whether this was Reaume's intent or not, the bank still would have suffered a loss. If the bank did not pay the checks, it was still exposed to a risk of loss as the court stated, and Reaume's intent still would have been to obtain funds of the bank through means of false and fraudulent pretenses and representations even though he was not successful. Under either scenario, Reaume's actions, at a minimum, exposed the bank to a risk of loss.

Again, these facts are contrasted with the charge against Rice. Rice, insofar as the Bill of Information and factual basis establish, made no false statements to Cohutta Banking Company, and she wrote no bad checks on an account where the bank might be left holding the bag. Nothing in the Bill of Information or factual basis suggests Rice's actions, if she was authorized by her employer to issue checks or cause checks to be issued, would have caused a transfer of funds that

17

would reduce the funds the bank had available for its loans and other activities. If APL bore the loss, as seems to be the case, then the bank would have had the same funds available and would see no reduction to make loans and carry on its other activities. In all three of the Sixth Circuit decisions discussed above, there was a clear risk of loss on the part of the victim banks. In fact, although the Court's research has not been exhaustive, the Court has been unable to locate a single case from any circuit where a conviction for bank fraud has been upheld and there has not been either a clear risk of loss on the part of the victim bank, or an intent on the part of the defendant to expose the victim bank to a risk of loss.

### G. Overinclusiveness of the Parties' Interpretation

To demonstrate that the parties position with respect to the scope of § 1344 and its interpretation of *Everett* cannot be accurate, one need only apply that interpretation to other real-world situations. The Eighth Circuit in *Staples* alluded to the problem, and *Everett* explicitly recognized the problem that the parties' interpretation would bring a wide variety of common street scams and frauds heretofore understood to be merely state matters or perhaps mail or wire fraud under the purview of § 1344. *Staples* mentioned the pigeon drop scam.[8] In this confidence game, the victim is approached by one or more perpetrators who represent they discovered a package containing a large amount of money near the victim. The victim is persuaded that the found money can be shared among the victim and the perpetrators. The victim is convinced that the "found money" can be legally shared with the victim but that the victim must put up a relatively smaller amount of his or her own money as earnest money to collect his or her share of the larger prize. Of

---

[8]The pigeon drop scam is described in great and colorful detail in *United States v. Jones*, 648 F. Supp. 225, 226-28 (S.D.N.Y. 1986).

course the "found money" is always not real.  In one scenario the victim is induced to stash the "found money" in her safety deposit box, and withdraw her own depository funds to give the perpetrators their shares.  Only later does the victim discover that the "found money" stashed in her safety deposit box is not genuine.

Another example of a common street level fraud or scam is the  "black money" scam.  *See, e.g.*, *United States v. Wright*, 642 F.3d 148, 149-51 (3rd Cir. 2011).   In this scam, the perpetrator presents "the potential victim with stacks of paper (and a few pieces of actual money) dyed black.  The perpetrator claims that the money was dyed black to allow it to be smuggled into the United States without intervention from the authorities.  The perpetrator then offers to sell the victim the money, along with chemicals to remove the dye."  *United States v. Fofana*, No. 09-6471, 2011 WL 2313155, *1, n.2 (6th Cir. June 10, 2011)  If the victim gives the perpetrator a check drawn on the victim's bank account or goes to the bank and withdraws money, then under the parties' interpretation of § 1344 a bank fraud has been committed even though the bank has no exposure to a loss, simply because the perpetrator deceived the victim into giving him money held by the bank.  Other common scams – such as the bank examiner scam,[9] advance fee scams,[10] home repair scams,[11]

---

[9]

At least two people are needed to pull off the bank examiner swindle.  One person will stand near a customer (the potential victim) in a bank and secretly get his or her name, account number and account balance.  Only those with sizable bank accounts become victims.  One of the swindlers will contact the victim either as the victim leaves the bank or later at home.  The swindler poses as a bank official, police officer, or FBI agent who is trying to trap a bank teller suspected of embezzling.  The victim is asked to assist by going to the particular teller's window to withdraw a specific large sum of money.  The victim is then instructed to bring the cash to a "bank official" (who is the swindler's partner) who will be waiting outside the bank.  The "bank official" will supposedly redeposit the money into the victim's account when the suspected embezzler is arrested.  Once the victim has handed over the cash, the "bank official" thanks the victim profusely and disappears with the victim's money.  No bank official, police officer, or FBI agent would ever ask a person to

male enhancement scams, and penny stock fraud – would, under the parties' interpretation, amount

withdraw money from his or her account under any circumstances.

New Hampshire Department of Justice, Consumer Sourcebook, Schemes, Swindles & Scams: The Bank Examiner Scheme, http://doj.nh.gov/consumer/sourcebook/schemes-swindles-scams.htm (last visited July 29, 2011).

[10]

An advance fee scheme occurs when the victim pays money to someone in anticipation of receiving something of greater value – such as a loan, contract, investment, or gift – and then receives little or nothing in return.

The variety of advance fee schemes is limited only by the imagination of the con artists who offer them. They may involve the sale of products or services, the offering of investments, lottery winnings, "found money," or many other "opportunities." Clever con artists will offer to find financing arrangements for their clients who pay a "finder's fee" in advance. They require their clients to sign contracts in which they agree to pay the fee when they are introduced to the financing source. Victims often learn that they are ineligible for financing only after they have paid the 'finder' according to the contract. Such agreements may be legal unless it can be shown that the "finder" never had the intention or the ability to provide financing for the victims.

Federal Bureau of Investigation, Common Fraud Schemes, www.fbi.gov/scams-safety/fraud (last visited July 29, 2011).

[11]

Example: Mr. Homoner, who is 82 years old, is raking his leaves. A dump truck drives slowly past, stops and backs up. The driver, a burly man who says his name is "Jay," says: "Me and the boys was just up the street aways fixing your neighbor's driveway. We got some hot top left over and we'll fix them holes in your driveway for a buck a foot." Mr. Homoner, who has been meaning to get his driveway fixed, agrees. When half his driveway is torn up, Mr. Homoner learns that the price is $10 a square foot. "Jay" and three massive "helpers" crowd around him telling Mr. Homoner that he must have misunderstood the price and demanding payment in cash. They offer to drive him to the bank to get it. Mr. Homoner should call the police and the Consumer Protection Bureau immediately before he pays "Jay" and associates any money.

New Hampshire Department of Justice, Consumer Sourcebook, Schemes, Swindles & Scams: Home Improvement Scheme, http://doj.nh.gov/consumer/sourcebook/schemes-swindles-scams.htm (last visited July 2p, 2011).

to bank fraud in violation of § 1344, so long as the victim wrote a check on his account or withdrew money from his bank account to give to the perpetrators of the fraud. In each of these instances, the banks are merely the repository of the victim's money. In the words of *Everett*, the banks have "minimal involvement" in the scams. The money obtained by the fraudsters is withdrawn by the victim from his or her bank account, or obtained by the victim writing a check on the victim's bank account. In any event, the bank bears no risk of loss. Pulling such schemes into the orbit of § 1344 would represent a massive and unprecedented expansion of the bank fraud statute, beyond any bounds presently recognized by courts or intended by Congress. Yet if these schemes do not qualify as bank fraud, as indeed they do not, then neither does Rice's conduct.

## II.     <u>CONCLUSION</u>

While the Court agrees with counsel that risk of loss is not an element of § 1344, it is always a relevant and ever present consideration. Under either prong of § 1344, the Bill of Information and factual basis in this case do not appear to satisfy the requirements of the statute. As explained above, *Everett* cannot support the proposition that merely having checks withdrawn from a bank in the course of a fraud is sufficient to support a bank fraud conviction. Indeed, Rice appears comparable to Everett's co-defendant, Mariani. Because Mariani was authorized by her employer to write checks, charges based upon Mariana's actions were dismissed at trial. Had Rice been the defendant in that case, we can reasonably assume charges would likewise have been dropped against her. Just so, the Court concludes it cannot find based upon the facts before it that Rice's charged conduct supports a bank fraud charge, and will thus **DENY** the parties' motion to reconsider (Court File No. 17).

Should the parties choose to amend the Bill of Information or file a superseding Bill of Information, the new charge should set out with much greater detail and specificity the scheme and artifice. If the defraud prong is used, the charges should specify exactly how the bank was or would have been defrauded; if the false pretense prong is used, the charges should set out the exact false pretense, representation, and/or promise that was made or used and how this false pretense, representation, and/or promise was communicated to the bank. Under either prong, much greater detail is necessary in alleging the scheme or artifice.

Should the parties choose to go forward with the present charge, they should carefully ponder and consider the wise caution given in *Everett*: "the government would [] be better advised to proceed under the wire or mail fraud statutes," and be mindful they will be asking the Court of Appeals for this circuit for the first time in its history to decide whether a defendant who exposed the bank to no risk of loss and had no intent to expose the bank to a risk of loss is guilty of an offense under the federal bank fraud statute.

**An order shall enter.**


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

22